IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

WESLEY HEALTH SYSTEM, LLC
d/b/a WESLEY MEDICAL CENTER                                    PLAINTIFF

V.                                             CIVIL ACTION NO. 2:12-CV-59-KS-MTP

FORREST COUNTY BOARD OF
SUPERVISORS d/b/a FORREST GENERAL
HOSPITAL, et al.                                               DEFENDANTS

MEMORANDUM OPINION AND ORDER

For the reasons stated below, the Court rules as follows:

·       The Court **denies** Wesley's Motion for Declaratory Judgment and
        Injunctive Relief [168];

·       The Court **grants** Forrest General's Motion for Summary
        Judgment [253];

·       The Court **grants** AAA's Motion for Summary Judgment [255, 261,
        270];

·       The Court **denies** AAA's Motion to Dismiss [150]; and

·       The Court **denies as moot** Wesley's Motion to Exclude Expert
        Testimony [251], Wesley's Motion to Strike [264], and AAA's
        Motion to Dismiss in Part [266].

I. BACKGROUND

Plaintiff Wesley Medical Center alleges that Defendants – Forrest General

Hospital and AAA Ambulance Service – conspired to divert patients from Wesley to

Forrest General. Wesley alleges that the Defendants ignored patients' desire to receive

medical services at Wesley, intentionally falsified medical records to justify

transporting patients to Forrest General, fraudulently obtained a disproportionate

share of trauma funds from the State of Mississippi, intentionally interfered with Wesley's business practices, defamed Wesley by making false statements about the quality and type of services it offered, and ignored Mississippi's Trauma System Destination Guidelines. Wesley asserted claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act,[1] claims under the Sherman Act,[2] civil conspiracy, intentional interference with business relations, and defamation.[3] Wesley also seeks a declaratory judgment that Mississippi law requires emergency medical service ("EMS") providers, such as AAA, to transport a patient to the hospital of their choice. If the Court finds to the contrary, Wesley seeks a declaratory judgment that the Mississippi Trauma Guidelines and related regulations are unconstitutional under both the Mississippi and United States Constitutions. The parties have filed many motions, and they are all fully briefed and ready for the Court's review.

## II. MOTION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF [168]

Wesley requests a declaratory judgment on two questions of law related to this dispute:

1.  Does the Plan allow an EMS provider, such as AAA, to ignore a lucid patient's expressed choice to receive medical services from a specific facility?

---

[1] 18 U.S.C. § 1861, et seq.

[2] 15 U.S.C. § 1, et seq.

[3] The Court previously dismissed all claims against Wade Spruill, the CEO of AAA. *See Wesley Health Sys., LLC v. Forrest County Bd. of Supervisors*, No. 2:12-CV-59-KS-MTP, 2012 U.S. Dist. LEXIS 145121, at *24-*26 (S.D. Miss. Oct. 9, 2012).

2.      Under Mississippi law, once a choice is clearly and expressly made by a lucid patient, may an EMS provider attempt to dissuade patients to be transported to another facility by providing false or misleading information?

Wesley contends that the answer to both questions is "No." Wesley also requests that the Court order AAA and Forrest General to "comply with patient choice and/or to fully satisfy the requirements of informed consent laws in Mississippi."

The Court uses a three-step analysis to determine whether it should consider a declaratory judgment claim. *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 387 (5th Cir. 2003). The Court considers: "(1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." *Id.*

The first element, justiciability, hinges on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Rowan Cos. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989). "A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Id.* A substantial controversy exists between the parties, and a legal question posed by Wesley's motion is necessary to the resolution of this case.

As for the second element, "a district court does not have authority to consider the merits of a declaratory judgment action when: (1) the declaratory defendant

3

previously filed a cause of action in state court; (2) the state case involved the same issues as those in federal court; and (3) the district court is prohibited from enjoining the state proceedings under [the Anti-Injunction Act]." *Sherwin-Williams*, 343 F.3d at 388 n. 1. The Court is unaware of any previous or concurrent cases addressing these issues in state court.

The final element incorporates a nonexclusive list of factors for the Court to consider:

(1)     whether there is a pending state court action in which all of the matters in controversy may be fully litigated;

(2)     whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant;

(3)     whether the plaintiff engaged in forum shopping in bringing the suit;

(4)     whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist;

(5)     whether the federal court is a convenient forum for the parties and witnesses;

(6)     whether retaining the lawsuit would serve the purposes of judicial economy; and

(7)     whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending.

*Id.* at 388 (quoting *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590-91 (5th Cir. 1994)).

None of these factors counsel dismissal of the entire declaratory judgment claim. The factors of judicial economy and party convenience counsel that the Court should

render a decision – at least in part. The questions posed by Wesley in its motion [168] do not mirror the declaratory relief requested in Count One of the Second Amended Complaint [145]. Both questions vary from Count One insofar as they raise the issue of lucidity, and they do not limit the Court's analysis to cases involving trauma patients. Furthermore, the second question's concern with "attempt[s] to dissuade patients . . . by providing false or misleading information" is wholly outside the scope of Count One.

When broadly construed, though, the motion raises a legal question within the scope of Count One and necessary to the resolution of this case: whether Mississippi law gives EMS providers authority to transport trauma patients to a designated trauma center despite their expressed desire to receive treatment at a different hospital that is not a designated trauma center. That is the question the Court will address.

## A.   *Mississippi Statewide Trauma Care System*

The Mississippi legislature directed the Department of Health to "establish and maintain a program for the improvement and regulation of emergency medical services . . . in the State of Mississippi." MISS. CODE ANN. § 41-59-5(1). Among other things, the legislature provided:

> The [Department of Health] . . . shall develop a uniform nonfragmented inclusive statewide trauma care system . . . . The department is assigned the responsibility for creating, implementing and managing the statewide trauma care system. . . . The department shall develop and administer trauma regulations that include, but are not limited to, the Mississippi Trauma Care System Plan, trauma system standards, trauma center designations, . . . [and] trauma care system evaluation . . . . The

5

department shall promulgate regulations specifying the methods and procedures by which Mississippi-licensed acute care facilities shall participate in the statewide trauma system. Those regulations shall include mechanisms for determining the appropriate level of participation for each facility or class of facilities. . . . The department shall promulgate rules and regulations necessary to effectuate this provision . . . . The department shall take the necessary steps to develop, adopt and implement the Mississippi Trauma Care System Plan and all associated trauma care system regulations necessary to implement the Mississippi trauma care system.

MISS. CODE ANN. § 41-59-5(5).[4] The legislature provided that the Trauma Care System shall be funded by the Mississippi Trauma Care Systems Fund and Mississippi Trauma Care Escrow Fund. MISS. CODE ANN. § 41-59-75.

Pursuant to this authority, the Department of Health developed the Mississippi Trauma Care System Plan.[5] "The goal of the Mississippi Trauma Care System is an inclusive model, where the trauma patient is transported directly from the scene of injury to a designated trauma center, staffed and equipped with the appropriate resources to care for the specific needs of the patient." *See* Mississippi Trauma Care System Plan, at 5. The Department requires all "Mississippi licensed hospitals with a functioning emergency department [to] apply for trauma center designation." MISS.

---

[4]A "trauma care system" is "a formally organized arrangement of health care resources that has been designated by the department by which major trauma victims are triaged, transported to and treated at trauma care facilities." MISS. CODE ANN. § 49-59-3(m). A "trauma care facility" or "trauma center" is "a hospital located in the State of Mississippi . . . that has been designated by the department to perform specified trauma care services within a trauma care system pursuant to the standards adopted by the department." MISS. CODE ANN. § 49-59-3(n).

[5]A copy of the Mississippi Trauma Care System Plan is attached as Exhibit B [191-2] to Forrest General's response to Wesley's Motion for Declaratory Judgment.

ADMIN. CODE § 15-2-32:1.2.1. After an application and inspection process, the Department designates hospitals as either Level I, II, III, or IV trauma centers, depending upon the resources available at each facility. MISS. ADMIN. CODE §§ 15-2-32:1.2.4, 1.2.5. "Every Mississippi licensed acute care facility (hospital) having an organized emergency room service or department shall participate in the Mississippi Statewide Trauma Care System." MISS. ADMIN. CODE § 15-2-32.1.3.10. But "[a]ny hospital that chooses not to participate in the Trauma Care System . . . , shall be assessed and shall pay a non-participation fee . . . ." MISS. ADMIN. CODE § 15-2-32:1.3.13.

### B.   *Trauma Care Regions*

Because different regions of the state may have different trauma care needs, the state is divided into several Trauma Care Regions. MISS. ADMIN. CODE §§ 15-2-32:1.5.1, 1.5.2. Each Trauma Care Region has a Board of Directors which exercises "administrative authority over the operation of the Trauma Care Region and subsequent trauma system programs." MISS. ADMIN. CODE § 15-2-32:1.5.3. At least one purpose of the Trauma Care Regions is to "develop policies which provide a clear understanding of the structure of the trauma system and the manner in which it utilizes the resources available to it." MISS. ADMIN. CODE § 15-2-32:1.5.8. Therefore, each Trauma Care Region is required to develop a Regional Trauma Plan, "which describes the policies procedures and protocols for a comprehensive system of prevention and management of major traumatic injuries in a specific geographical region." MISS. ADMIN. CODE §§ 15-2-32:1.1.4, 1.5.6. The Regional Trauma Plans are

7

incorporated within the statewide Mississippi Trauma Care System Plan. *See* Mississippi Trauma Plan, at 4. "All participating hospitals and licensed EMS providers in each Region shall abide by the Region Trauma Plan and policies." MISS. ADMIN. CODE § 15-2-32:1.5.9.[6]

## C.   *Southeast Trauma Care Region*

The parties here are in the Southeast Trauma Care Region ("SETCR"). The SETCR is governed by a twelve-member Board of Directors comprised of representatives from hospitals within the SETCR's thirteen counties. SETCR Trauma Plan, at 19.[7] The SETCR is managed – under direction of the Board – by Defendant AAA Ambulance Service, and the CEO of AAA, Defendant Wade Spruill, serves as the CEO of the SETCR. *Id.* at 4-5. There are currently thirteen hospitals with emergency rooms in the SETCR. *Id.* at 26. One of them, Defendant Forrest General Hospital, is a Level II Trauma Center. *Id.* at 27. Of the remaining twelve, one is a Level III Trauma Center, and ten are Level IV Trauma Centers. *Id.* at 27-28. Plaintiff Wesley Medical Center only recently elected to participate in the Trauma Care System; it is seeking designation as a Level III Trauma Center.[8] On November 7, 2013, the Mississippi

---

[6]*See also* Mississippi Trauma Plan, at 9 ("Once approved and included in the state trauma plan, the regional trauma plan[s] are binding on all EMS providers and acute-care facilities within the respective region."); SETCR Trauma Plan, at 70 ("All In-Region Trauma Centers and EMS Agencies within the SETCR shall comply with the Regional Plan . . . .").

[7]A copy of the SETCR Trauma Plan is attached as Exhibit C [191-3] to Forrest County's response to Wesley's Motion for Declaratory Judgment.

[8]*See* Exhibit "2" [266-2] to AAA's Motion to Dismiss in Part as Moot.

Department of Health advised the SETCR that Wesley could be treated as if it had already received a Level III designation, but Wesley did not participate in the Trauma Care System at any time relevant to this case.

**D.      *Destination Guidelines***

The Mississippi Trauma Plan directs Trauma Care Regions to establish "destination protocols" to "assure trauma patients receive access to the most appropriate care based on their injuries," and which are "designed to deliver trauma patients to the closest, most appropriate facility, regardless of the nearest facility or the affiliation of the ambulance service." Mississippi Trauma Plan, at 10. The SETCR elected to adopt the Department of Health's Consolidated Activation Criteria and Destination Guidelines:

> All ambulance services operating within the Southeast Trauma Care Region will utilize Mississippi State Department of Health approved policies, procedures, and protocols for the purpose of patient treatment and activation and destination guidelines. The policies, procedures, and protocols for determining triage criteria and patient destination adopted by the State will be followed by the region.

SETCR Trauma Plan, at 67.

Therefore, in the SETCR "[a]ll trauma care patients will receive initial evaluation for categorization as Alpha or Bravo using State approved activation criteria," and "[p]atient destination will be in accordance with State approved destination guidelines." *Id*. The SETCR Plan also provides that "[l]ocal ambulance provider(s) shall be dispatched to scene under authority of provider's medical control plan," and the "[l]ocal medical control plan shall direct ambulance provider to nearest

appropriate designated trauma center in accordance with the State Activation and Destination Guidelines . . . ." *Id.* at 51.

Mississippi's Consolidated Trauma Activation Criteria and Destination Guidelines consist of a flow chart with instructions.[9] EMS providers must first measure a patient's vital signs and level of consciousness and assess their injury. *Id.* Injuries/conditions are categorized as either Alpha or Bravo, but both categories broadly include room for "EMS/Health Provider Judgment." *Id.* For patients over fifteen years of age, both Alpha and Bravo patients require transport to a Level I, II, or III Trauma Center "as appropriate for injuries." *Id.* If the patient is not qualified as either Alpha or Bravo, the Guidelines say to "[t]ransport according to local EMS protocol (consider contacting Medical Control)." *Id.* They also include a list of "SPECIAL CONSIDERATIONS," such as: "Patients > 55 years are at increased risk of injury/death," and "Anticoagulents and bleeding disorders." *Id.* They also provide: "If there is any question concerning appropriate patient destination, or if requested by the patient or another person to deviate from this protocol, **CONTACT MEDICAL CONTROL**." *Id.* (emphasis original).

## E.   *Medical Control*

"Medical Control" is "[p]hysician direction over pre-hospital activities to ensure efficient trauma triage, transportation, and care, as well as ongoing quality management." MISS. ADMIN. CODE § 15-2-32.1.1.4. All EMS providers must establish

---

[9]The Destination Guidelines can be found at p. 144 of Exhibit "A" [191-1] to Forrest County's Response to Wesley's Motion for Declaratory Judgment.

a "plan of medical control" which includes "patient destination criteria and treatment protocols for the patient . . . ." MISS. ADMIN. CODE § 15-12-31:1.1.5. "All Medical Control Plans shall comply with the Mississippi State Trauma Plan and all other applicable system of care plans as directed by the Mississippi State Department of Health, Bureau of Emergency Medical Services." *Id.*

Medical Control Plans should establish "off-line" medical directors, who provide "the administrative promulgation and enforcement of accepted standards for out-of-hospital care." MISS. ADMIN. CODE § 15-12-31:1.1.6, Appendix 1. Off-line Medical Directors have the authority to "[e]stablish criteria for determining patient destination in a non-discriminatory manner in compliance with state guidelines as appropriate," and to establish the "circumstance a patient may be transported against his will . . . ." MISS. ADMIN. CODE § 15-12-31, Appendix 1. On-line Medical Directors provide instructions "directly to out-of-hospital providers . . . , generally in an emergency situation, either on-scene or by direct voice communication." *Id.* Two doctors serve as the off-line and on-line medical directors under the SETCR's Medical Control Plan: John C. Nelson and William E. Walker.[10] Additionally, "[o]n-line medical control responsibilities are assigned to on-duty emergency room physicians at Forrest General Hospital . . . ." *Id.* at p. AAAProd007101.

While the regulations allow for a patient's private physician to intervene in some circumstances, EMS providers must follow the orders of the on-line medical director,

---

[10]*See* Exhibit "G" [191-7] to Forrest County's Response to Wesley's Motion for Declaratory Judgment, p. AAAProd007100.

11

and the regulations specifically provide that nothing contained in them "implies that the pre-hospital provider CAN be required to deviate from system protocols." MISS. ADMIN. CODE § 15-12-31, Appendix 1. The SETCR Medical Control Plan provides: "All trauma patients should be treated in accordance with current protocols and transported to appropriate destinations as delineated by the State Trauma Plan and Trauma Destination Guidelines." *See* SETCR Medical Control Plan [191-7], at p. AAAProd007105. Additionally, the SETCR Trauma Plan provides: "Local medical control plan shall direct ambulance provider to nearest appropriate designated trauma center in accordance with the State Activation and Destination Guidelines . . . ." SETCR Trauma Plan, at 51. Consistent with these regulations, Dr. John Nelson testified [243]: "Once a medic calls in and says, 'I think this is a trauma patient,' my answer would simply be, 'If you declare this a trauma patient, then you need to abide by the trauma destination guidelines.' End of story." He further testified that in the SETCR EMS providers may only deviate from the Destination Guidelines if a patient goes into cardiac arrest or needs intubation.

## F.   *Summary*

All Mississippi-licensed EMS providers in the SETCR are required by law to comply with the Mississippi Trauma Plan, the SETCR Trauma Plan, and the State Destination Guidelines. MISS. ADMIN. CODE §§ 15-12-31:1.2.5, 15-2-32:1.5.10; Mississippi Trauma Plan, at 9; SETCR Trauma Plan, at 70. According to the Trauma Plans and Guidelines, trauma patients must be transported to a designated Level I, II, or III Trauma Center. If a trauma patient does not wish to be transported to a

12

designated Trauma Center, the EMS provider can only abide by the patient's wishes if permitted to do so by Medical Control. In the SETCR, the Medical Control Plan requires that all trauma patients be transported in accordance with the Guidelines, and EMS providers may only deviate from this protocol if the patient goes into cardiac arrest or needs intubation. Therefore – absent contrary authorization from Medical Control – EMS providers in the SETCR must transport trauma patients to a designated trauma center despite the patient's expressed desire to go to a hospital that is not a designated trauma center.

## G.   *Wesley's Objections*

Wesley raises two primary objections to this interpretation of Mississippi law. First, Wesley argues that the statutes and regulations discussed above do not provide EMS providers with clear, unquestionable authority to ignore patient choice. The Court disagrees. As previously noted, all Mississippi-licensed EMS providers in the SETCR must comply with the Mississippi Trauma Plan, the SETCR Trauma Plan, and the Destination Guidelines. MISS. ADMIN. CODE §§ 15-12-31:1.2.5, 15-2-32:1.5.10; Mississippi Trauma Plan, at 9; SETCR Trauma Plan, at 70. Every stage in the regulatory scheme – the enabling statutes, the regulations, the Mississippi Trauma Care System Plan, the SETCR Trauma Plan, the Destination Guidelines, and the Medical Control Plan – promotes the central goal of ensuring that trauma patients receive treatment at a designated trauma center with sufficient resources to handle their injuries. *See* Mississippi Trauma Plan, at 11. Indeed, the Court's analysis above demonstrates that EMS providers are required by law to ignore patient choice if it

13

conflicts with the Destination Guidelines and instructions from Medical Control.[11]

Wesley also argues that these regulations do not supersede Mississippi's common-law requirement that "[n]o physician or hospital may subject one to medical treatment without that person's informed consent." *In re Brown*, 478 So. 2d 1033, 1040 (Miss. 1985); *see also Fox v. Smith*, 594 So. 2d 596, 604 (Miss. 1992). This common-law principle was "given constitutional status by Article 3, § 32 of the Mississippi Constitution of 1890." *Brown*, 478 So. 2d at 1040. Wesley effectively argues, therefore, that the regulations are invalid because they violate the Mississippi Constitution. The Court declines to consider this argument. Wesley has not sought joinder of the Mississippi Department of Health, an indispensible party with respect to Wesley's constitutional claims. *See Lewis v. La. State Bar Assoc.*, 792 F.2d 493, 496 n. 2 (5th Cir. 1986); *Hefner v. Alexander*, 779 F.2d 277, 282 (5th Cir. 1985).

## H.   *Conclusion*

For all of the reasons stated above, the Court denies Wesley's Motion for Declaratory Judgment and Injunctive Relief [168]. A portion of the requested relief exceeds the scope of Count One of the Wesley's Second Amended Complaint [145], and

---

[11] Wesley argued that a Memorandum [168-12] from the Department of Health dated May 17, 2010, establishes that state policy is that "the patient's choice should be honored." This argument fails for two reasons. First, an advisory memo does not carry the same legal authority as regulations promulgated by a state agency by authorization of the legislature. Second, Wesley misrepresented the memo's instructions. The Department advised that "any deviation from the protocols should be communicated and approved by medical control." If a patient refuses transport to the facility required by the guidelines, the EMS provider may only honor that choice if "medical control authorizes." The memo does not conflict with the regulations discussed above.

examination of the relevant state regulations demonstrates that EMS providers must comply with the Destination Guidelines unless Medical Control provides authorization to deviate from them. In light of these rulings, there is no basis for Wesley's requested injunctive relief.

### III. MOTION FOR SUMMARY JUDGMENT – FORREST GENERAL [253]

Forrest General filed a Motion for Summary Judgment [253] that incorporates the arguments presented in its previous Motion for Summary Judgment [122], which the Court denied [141] pursuant to Rule 56(d). The parties have completed discovery, and the Court may now address Forrest General's arguments.

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (punctuation omitted). The nonmovant "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (punctuation omitted). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812.

The Court is not permitted to make credibility determinations or weigh the

evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

## A.    *Tortious Interference and Defamation*

Wesley conceded its state-law claims of defamation and tortious interference with business relations against Forrest General. The Court grants Forrest General's motion for summary judgment as to those claims.

## B.    *Sherman Act*

Forrest General argues that it is incapable of conspiring with AAA because it controls it. "Section 1 of the Sherman Act . . . reaches unreasonable restraints of trade effected by a contract, combination or conspiracy between separate entities. It does not reach conduct that is wholly unilateral." *Copperweld Corp. v. Independence Tube Corp.*, 467 US. 752, 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984) (punctuation omitted).

> [A]n internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.

*Id.* at 769, 104 S. Ct. 2731. Therefore, "officers or employees of the same firm do not

16

provide the plurality of actors imperative for a § 1 conspiracy." *Id.* Likewise, "§ 1 is not violated by the internally coordinated conduct of a corporation and one of its unincorporated divisions," *Id.* at 770, 104 S. Ct. 2731, and "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Id.* at 771. Coordination among such parties "does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests." *Id.*

"[S]ubstance, not form, should determine whether an entity is capable of conspiring under § 1." *American Needle, Inc. v. NFL*, 560 U.S. 183, 195, 130 S. Ct. 2201, 176 L. Ed. 2d 947 (2010) (punctuation omitted).

> [T]he question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved seem like one firm or multiple firms in any metaphysical sense. The key is whether the alleged contract, combination or conspiracy is concerted action – that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a contract, combination or conspiracy amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition.

*Id.* (punctuation and internal citations omitted). The "inquiry is one of competitive reality." *Id.*

According to AAA's corporate charter [122-2], it was created by the Board of Trustees of the Forrest County General Hospital to "provide ambulance service to the citizens . . . of the City of Hattiesburg, Mississippi and of the County of Forrest, State of Mississippi," and to "own, operate and maintain a public ambulance service facility

. . . as an integral part of the governmental function of the Board of Trustees." The bylaws require that Forrest General fund half of AAA's operating deficits and capital expenditures, while the City and County each contribute one-fourth of the necessary funds. According to Evan Dillard [254-4] – AAA's Chairman of the Board and Forrest General's CEO – Forrest General recently transferred $200,000.00 to AAA in accordance with this requirement.

AAA is owned by Forrest General, the City of Hattiesburg, and Forrest County. Its Board of Directors has six members. Four of the directors represent Forrest General, while the City of Hattiesburg and Forrest County each have one representative on the Board. Therefore, Forrest General controls four out of six votes in every decision made by AAA's Board of Directors. Additionally, the Chairman of AAA's Board – Evan Dillard – is the Chairman, President, and CEO of Forrest General. AAA's officers – CEO, CFO, and COO – are all employees of Forrest General.

As for AAA's operations, Forrest General and AAA executed a General Management Services Agreement [271-17]. AAA's Board of Directors contracted with Forrest General to provide AAA's management. But the contract specifically provides that "AAA has, and at all times during the Term shall exercise, the ultimate control and direction of the assets and affairs of Service." Notwithstanding this language, the contract stipulates that Forrest General has the authority and responsibility to operate all aspects of AAA's services, including hiring, promoting, discharging, supervising, budgeting, and capital expenditures. Also, AAA's key personnel – Administrator, CFO, and Director of Operations – must be employees of Forrest General.

18

Dillard – Forrest General's CEO and AAA's Chairman of the Board – testified [254-4] that AAA submits its budget to Forrest General for approval, and that AAA's financial statements are consolidated with Forrest General's. Wade Spruill – AAA's CEO and Forrest General's employee – testified both that AAA maintains a "separate set of books and records" from Forrest General [271-15], and that employees of Forrest General control the operations of AAA [254-5].

Under the *American Needle* analysis, corporate formalities are meaningless. *Id.* at 196. "The key is whether the alleged contract, combination, or conspiracy is concerted action – that is, whether it joins together separate decisionmakers." *Id.* at 195 (punctuation omitted). The alleged conspirators must be "separate economic actors pursuing separate economic interests." *Id.* "The question is whether the agreement joins together independent centers of decisionmaking. If it does, the entities are capable of conspiring under § 1 . . . ." *Id.* at 196.

The evidence cited above demonstrates that Forrest General controls AAA, and that they do not constitute two separate, independent decisionmakers. Forrest General controls two-thirds of the voting power on AAA's Board, and AAA's officers are Forrest General employees. Through these positions and the authority granted it by the General Management Services Agreement, Forrest General controls all of AAA's operations – in spite of the Agreement's apparently empty provision that AAA maintains "ultimate control and direction" of its operations. Indeed, Wesley's corporate representative and its CEO admitted [254-2, 254-3] that AAA's operations were directed and controlled by Forrest General. During oral argument, Wesley's own

19

counsel described [254-1] the relationship among AAA, Forrest General, and the SETCR as "incestuous." Counsel argued:

> Forrest General Hospital controls AAA and provides all the senior management to AAA. . . . There is a contract between AAA and the Southeast Trauma Care Region in which AAA runs the trauma care region. So, in other words, you've got Forrest General Hospital . . . controlling AAA and, in turn, controlling the trauma care region. So when AAA and Forrest General say that AAA is forced to follow guidelines from the trauma care region, what they're saying is, "We're forced to follow the guidelines that we prepared ourselves."

The evidence indicates that Counsel's representations are true, that Forrest General controls AAA, and that they are incapable of conspiring with one another under Section One of the Sherman Act.

Wesley offered several specific objections that the Court must address. First, Wesley argued that AAA and Forrest General are separate and distinct corporate entities. As discussed above, corporate formalities are meaningless in determining whether two parties are capable of conspiring under Section One of the Sherman Act. *Id.* at 195-96. Wesley also noted that AAA and Forrest General have entered into contracts with one another. This is an extension of the corporate formalities argument. Two distinct corporate entities can, of course, enter into contracts with one another. The crux of the matter is whether their decisions to do so stem from the same source or separate sources. It is undisputed that Forrest General controls AAA's decisions in such matters.

Despite its own counsel's argument to the contrary, Wesley also contends that there exists a genuine dispute of material fact as to whether Forrest General controls

AAA. First, Wesley cites testimony from Spruill, CEO of AAA. Spruill testified [271-15] that AAA and Forrest General are "different, but the ownership is multi-faceted, the hospital being the primary, and the City and County involved, as well." Spruill also testified that he had separate duties in his various roles at AAA, Forrest General, and the SETCR, that AAA has some separate employees from Forrest General, and that it maintains separate "books and records." But this testimony has no bearing on the key issue here: whether Forrest General controls AAA's operations, with the two entities functioning as a single decisionmaker.

Several AAA employees provided testimony as to their understanding of the relationship between AAA and Forrest General. Crystal Boutwell testified [271-8] that she was not sure whether Forrest General owned AAA, but that she had "always been told that AAA is a separate entity from the hospital." Kacey Jones testified [271-9] that she did not know whether Forrest General owned or controlled AAA. Finally, Kayla Simmons [271-10] testified that she knows that Forrest General owns "a portion [of AAA] in conjunction with other entities." She said her understanding was that Forrest General does not exercise "100 percent" control of AAA, but that it does "have some input."

This testimony is not sufficient to create a genuine factual dispute over Forrest General's control of AAA. Most of it is inadmissible hearsay or speculation. Further, AAA employees' understanding of corporate formalities and Forrest General's ownership interest in AAA is irrelevant to the issue of actual control. At best, these witnesses were guessing as to Forrest General's control of AAA. *See Oliver*, 276 F.3d

at 744 (speculation and unsubstantiated assertions do not create a genuine issue for trial).

Finally, Wesley argues that a Sherman Act claim is viable regardless of whether Forrest General can conspire with AAA, as there are other members of the alleged conspiracy. Wesley argues that the SETCR, City of Hattiesburg, and Forrest County all conspired with Forrest General to divert more patients to Forrest General for treatment. But that is not the theory of liability that Wesley has advanced for the past twenty months of litigation. Wesley has consistently framed this case as one concerning a conspiracy between Forrest General and AAA.[12] Although Wesley alleged [145] that Forrest General, AAA, and "others" conspired to divert patients, Wesley did not name any "others" or explain their role in the alleged conspiracy. Indeed, Wesley first argued this alternate theory in response to Defendants' motions for summary judgment.

Therefore, the Court concludes that Wesley did not plead a Sherman Act claim involving conspirators other than those specifically named as Defendants. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005). Even if Wesley had raised such a claim, it was not sufficiently pled, as Wesley did not name the other conspirators. *See Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) ("A naked allegation of conspiracy or

---

[12]Wesley also initially named Spruill as a conspirator, but he was dismissed. *Wesley*, 2012 U.S. Dist. LEXIS 145121 at *24-*26.

agreement, without more specific factual allegations, is not to be accepted as sufficient to state a claim under Section 1 of the Sherman Act.").

For all of the reasons stated above, the Court finds that there is no genuine issue of material fact as to whether Forrest General and AAA constitute "separate economic actors pursuing separate economic interests." *American Needle*, 560 U.S. at 196. The evidence demonstrates that Forrest General controls AAA. They are, therefore, incapable of conspiring under Section 1 of the Sherman Act. *Id.* The Court grants Forrest General's motion for summary judgment as to Wesley's Sherman Act claim.

## C.    *Civil Conspiracy*

Among other arguments, Forrest General contends that the intra-corporate conspiracy doctrine also applies to Wesley's state-law civil conspiracy claim. The Mississippi Supreme Court has never addressed the intra-corporate conspiracy doctrine. *Blades v. Countrywide Home Loans, Inc.*, No. 1:06-CV-1000-LG-JMR, 2007 U.S. Dist. LEXIS 69903, at *6 (S.D. Miss. Sept. 18, 2007). "To determine issues of state law, we look to final decisions of the state's highest court, and when there is no ruling by that court, then we have the duty to determine as best we can what the state's highest court would decide." *James v. State Farm Mut. Auto. Ins. Co.*, 719 F.3d 447, 451 (5th Cir. 2013).

"Under Mississippi law, a conspiracy is a *combination of persons* for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Gallagher Bassett Servs. v. Jeffcoat*, 887 So. 2d 777, 786 (Miss. 2004) (emphasis added). Two or more parties must come to an agreement – or meeting of the minds – to form a

conspiracy. *Id.* at 786-87; *see also Braddock Law Firm, PLLC v. Becnel*, No. 2012-CA-345-COA, 2013 Miss. App. LEXIS 473, *10-*11 (Miss. Ct. App. Aug. 6, 2013). These Misssissippi cases suggest that a conspiracy can not be formed unless two separate, independent parties reach an agreement.

The Court further notes that both District Courts in this state have applied the intracorporate conspiracy doctrine to civil conspiracy claims under Mississippi law, holding that a corporation can not conspire with its own employees or agents. *See Frye v. Am. Gen. Fin., Inc.*, 307 F. Supp. 2d 836, 843 (S.D. Miss. 2004); *Cooper v. Drexel Chem. Co.*, 949 F. Supp. 1275, 1285 (N.D. Miss. 1996); *Cirillo v. Cent. Miss. Radiology, LLC*, No. 4:11-CV-24-JMV, 2013 U.S. Dist. LEXIS 87026, at *7 (N.D. Miss. June 19, 2013); *Gardner v. Swedish Match N. Am., Inc.*, No. 2:04-CV-337-KS-JMR, 2006 U.S. Dist. LEXIS 44680, at *12-*13 (S.D. Miss. Apr. 17, 2006). The Fifth Circuit has done the same. *Aiken v. Rimkus Consulting Group, Inc.*, 333 F. App'x 806, 812 (5th Cir. 2009); *Allstate Life Ins. Co. v. Parnell*, 292 F. App'x 264, 376-77 (5th Cir. 2008).

In light of these authorities, the Court concludes that the Mississippi Supreme Court would apply the intra-corporate conspiracy doctrine to a civil conspiracy claim under Mississippi law. For the same reasons stated above, the Court finds that there is no genuine issue of material fact on this issue. The evidence demonstrates that Forrest General controls AAA, and that they are incapable of conspiring with one another. The Court grants Forrest General's motion for summary judgment as to Wesley's civil conspiracy claim.

**D.   *Civil RICO***

24

The Court grants Forrest General's motion for summary judgment as to Wesley's civil RICO claim for the same reasons stated in the Court's analysis of AAA's motion for summary judgment.

## IV. MOTION FOR SUMMARY JUDGMENT – AAA [255, 261, 270]

AAA filed its own Motion for Summary Judgment [255, 261, 270], which incorporates the arguments from its previous Motion for Summary Judgment [125] and Forrest General's motions.

### A.    *Sherman Act, Civil Conspiracy*

The Court grants AAA's motion for summary judgment as to Wesley's Sherman Act and civil conspiracy claims for the same reasons stated in the Court's analysis of Forrest General's motion for summary judgment.

### B.    *RICO*

A civil RICO claim has three elements: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Huntington Nat'l Bank v. McCann*, 268 F. App'x 359, 365 (5th Cir. 2008). To establish that Forrest General engaged in a "pattern of racketeering activity," Wesley must show that it committed at least two acts of racketeering activity, as defined by 18 U.S.C. § 1961(1). 18 U.S.C. § 1961(1), (5). Wesley argues that Forrest General committed at least two acts of kidnapping by inveiglement.[13] A person commits kidnapping by inveiglement if, "without lawful

---

[13]In the Second Amended Complaint, Wesley alleged that Defendants committed a variety of predicate acts, but in briefing the pending motions it only

authority and with or without intent to secretly confine," they "inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will . . . ." MISS. CODE ANN. § 97-3-53 (2013).

To "inveigle" means to accomplish a kidnapping by use of enticement, trickery, or deceit. *Evans v. State*, 725 So. 2d 613, 665 (1997); *Williams v. State*, 544 So. 2d 782, 790 (Miss. 1987). "Inveigling has no component of force, but only of coaxing. One does not forcibly inveigle. Guilt exists if [the accused] coaxed the [victim] into his vehicle with the intent to . . . confine her against her will." *Myers v. State*, 770 So. 2d 542, 544 (Miss. Ct. App. 2000). In an earlier opinion, the Court held that "kidnapping is not a specific intent crime." *Wesley Health Sys., LLC*, 2012 U.S. Dist. LEXIS 145121 at *6 (citing *Milano v. State*, 790 So. 2d 179, 187 (Miss. 2001)). In retrospect, the Court's analysis of this issue was shallow, at best. The Court withdraws that opinion to the extent it conflicts with this one.

Although the Mississippi Supreme Court has stated that "kidnapping is not a specific intent crime," *Milano*, 790 So. 2d at 187 (citing *Williams v. State*, 445 So. 2d 798, 809 (Miss. 1984)), such statements can not reasonably be interpreted as abrogating the statute's clear requirement of a mental state. *See* MISS. CODE ANN. § 97-

---

addressed kidnapping by inveiglement. When a defendant files a motion for summary judgment and "the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate the absence of evidentiary support in the record for the nonmovant's case." *Cuadra*, 626 F.3d at 812. The nonmovant "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* Wesley provided no evidence or argument that either Defendant committed any of the other predicate acts alleged in the Second Amended Complaint. Therefore, the Court assumes that Wesley concedes those allegations.

3-53 (". . . with intent to cause such person to be confined or imprisoned against his or her will . . ."). Indeed, the Supreme Court has acknowledged that intent is an element of the crime. *Conley v. State*, 790 So. 2d 773, 794 (Miss. 2001); *Carr v. State*, 655 So. 2d 824, 849 (Miss. 1995); *see also Myers*, 770 So. 2d at 544 (requiring intent to confine the victim against her will). This becomes clearer when the isolated statement that "kidnapping is not a specific intent crime" is read in its full context:

> [I]t is conceivable that a reasonable juror could have found that [the victim] was inveigled, i.e., enticed or tricked, with intent to . . . confine her against her will. As kidnapping is not a specific intent crime, it is sufficient that the circumstances resulted in such a manner as to effect a kidnapping as opposed to an actual intent to kidnap, i.e. it is not necessary to establish the mental state of intent by direct evidence.

*Williams*, 544 So. 2d at 790. In other words, intent to confine or imprison the victim against his or her will is an element of kidnapping by inveiglement, but a fact-finder may infer the necessary intent from circumstantial evidence of the circumstances surrounding the alleged kidnapping.

AAA offered a variety of arguments challenging the sufficiency of Wesley's evidence to prove the elements of kidnapping by inveiglement. In response, Wesley addressed six specific patients – Bland Simmons, Glynda Kranz, Orlea Risk, Mary Ann Nester, John Rayner, and Frances Chisolm – arguing that AAA kidnapped each of them. The Court need only address five of the patients.

*1.   Bland Simmons*

First, Wesley failed to present any evidence that AAA inveigled Bland Simmons. Inveiglement requires enticement, trickery, deceit, or coaxing. *Evans*, 725 So. 2d at

27

665; *Williams*, 544 So. 2d at 790; *Myers*, 770 So. 2d at 544. Colonel Simmons testified [168-10] that he asked to go to Wesley, but after consulting with a supervisor, the AAA employees said they had to take him to Forrest General. He said: "[T]hey made an effort to call their dispatch, and they made contact with some people there, and it was a supervisor that either came on the radio or that . . . person contacted that said, no, take him to Forrest General." According to Colonel Simmons' AAA Patient Care Report [168-11], the instructions came from Dr. Mike Farmer, the on-line Medical Director. No inveiglement, deceit, trickery, or coaxing was involved. In fact, when asked whether he believed AAA had tricked or misled him, Colonel Simmons answered: "No. I think they did what their boss told them to do."

> ### 2. *Glynda Kranz*

Glynda Kranz's AAA Patient Care Report [168-6] indicates that the nature of the call was for "Traumatic Injuries," and her "condition code" was for "other Trauma (fracture/dislocation)." According to the report, Ms. Kranz – a 69-year-old patient – slipped and fell from a standing position, dislocating and fracturing her right ankle in the process. According to the EMT, "[t]here was obvious deformity to the right ankle with 60 degrees medial angulation." At her deposition [168-5], Ms. Kranz agreed that her ankle was obviously deformed. The EMT classified her as a Bravo-level trauma patient, citing the criteria: "Special Considerations: Age > 55." Ms. Kranz spent three days in the hospital and underwent orthopedic surgery to repair the damage to her ankle.

The evidence cited above demonstrates that AAA's transportation of Glynda

Kranz was not "without lawful authority," as required to prove kidnapping by inveiglement. *See* MISS. CODE ANN. § 97-3-53. The Destination Guidelines [191-1] include a list of criteria for Bravo-level trauma patients that leaves room for the exercise of "EMS/Health Provider Judgment." They also include a list of "SPECIAL CONSIDERATIONS" to consider, including: "Patients > 55 years are at increased risk of injury/death." According to the evidence, the EMT took Ms. Kranz's age into account and exercised the judgment granted him by the Guidelines, a decision within the scope of his authority under Mississippi law.

    3.    *Orlea Risk*

Orlea Risk slipped off her bed and injured her hip [125-10], but the docket contains no evidence of the extent and nature of her injuries. Ms. Risk's niece stated [125-10] that AAA employees told her that Risk "was a trauma patient and that they could not take her to Wesley because all trauma patients had to go to Forrest General. They also told [her] that they would 'get in trouble' if they took her to Wesley."

This evidence does not demonstrate that AAA inveigled Ms. Risk. The EMT classified Ms. Risk as a trauma patient, and it is undisputed that Wesley was not a designated trauma center at the time of these events. As previously noted, unless they receive contrary authorization from Medical Control, EMS providers in the SETCR must transport trauma patients to a designated trauma center. Wesley has not presented any evidence to dispute the EMT's categorization of Risk as a trauma patient. Therefore, Wesley failed to demonstrate that AAA's transportation of Orlea Risk was "without lawful authority." *See* MISS. CODE ANN. § 97-3-53.

4.    *Mary Ann Nester*

Mary Ann Nester [125-21, 168-2], a seventy-four-year-old woman, fell forward from a standing position, and her head landed on a metal landscaping border, lacerating her forehead. According to AAA's report [168-3], Ms. Nester lay on the sidewalk when the ambulance arrived. She never lost consciousness, but she had a 3-inch cut in her forehead which bled profusely despite the application of direct pressure. Once the EMT placed Ms. Nester on the stretcher, she became nauseated and vomited, and she vomited three more times on the way to the hospital. The EMT classified her as a Bravo-level trauma patient and noted that she had uncontrolled bleeding and suspected internal injuries. Nester later received sixteen stitches and a CT scan at Forrest General.

As with patients Risk and Kranz, Wesley has failed to present evidence that AAA's transportation of Ms. Nester was "without lawful authority." *See* MISS. CODE ANN. § 97-3-53. The EMT categorized Nester – a patient over 55 profusely bleeding from the head and demonstrating concussion symptoms[14] – as a Bravo-level trauma patient. As such, AAA was required by law to transport her to a designated trauma

---

[14]The Court takes judicial notice of the fact that nausea and vomiting following a head injury are common symptoms of a concussion. FED. R. EVID. 201(b); *see e.g. Nivens v. Signal Oil & Gas Co.*, 520 F.2d 1019, 1025 (5th Cir. 1975) (nausea and dizziness are classic symptoms of a concussion); 1-C Attorneys' Dictionary of Medicine C-27769 (2009) (vomiting a symptom of concussion); Jarryd Werts, *Ringing the Bell on Concussions: The Rise of Head Injuries and Cognitive Decline in Football Players, and the NFL's Obligation to Improve Safety Measures*, 11 Cardozo Pub. L. Pol'y & Ethics J. 173, 177 (2012) (discussing symptoms of concussion and citing sources).

center.

### 5.   *John Rayner*

John Rayner, a sixty-seven-year-old man weighing approximately three hundred pounds fell off his bed. At the time, Mr. Rayner suffered from advanced liver failure. He periodically underwent episodes of hepatic encephalopathy, a condition which his wife described [168-7] as causing confusion, hallucinations, and the inability to communicate or respond to inquiries. When AAA's employees arrived [168-9], Mr. Rayner lay prone on the floor, non-verbal, unable to assist or communicate with AAA's employees. According to Ms. Rayner [168-9], AAA's employees suggested that he could have suffered a head injury during the fall. In light of Mr. Rayner's age, advanced liver failure, suspected head injury, and their inability to determine his mental status, the EMT's exercised their judgment and declared him a Bravo-level trauma patient.

As with the other patients above, Wesley failed to present evidence that AAA's transportation of Mr. Rayner was "without lawful authority." *See* MISS. CODE ANN. § 97-3-53. AAA's employee categorized Rayner – a patient over 55 that had fallen from his bed, was unable to communicate, and suffering from advanced liver failure and a suspected head injury – as a Bravo-level trauma patient. As such, AAA was required by law to transport him to a designated trauma center.

### 6.   *Summary*

To establish a valid RICO claim, Wesley must demonstrate that AAA kidnapped at least two of the six patients they addressed in briefing. *See* 18 U.S.C. § 1961(1), (5). As demonstrated above, Wesley failed to create a genuine dispute of material fact with

respect to at least five of the six patients. In those five case, either AAA had lawful authority to transport the patient to Forrest General, or there was no evidence of inveiglement or intent to confine them against their will. Accordingly, the Court grants AAA's motion for summary judgment as to Wesley's RICO claim.

## C.   *Tortious Interference and Defamation*

Finally, AAA argues that it is immune from liability for Wesley's state-law tort claims because it is an instrumentality of three political subdivisions. The Mississippi Tort Claims Act generally provides that the State and its political subdivisions waive sovereign immunity from suits arising from acts or omissions committed during the course and scope of employment, except where the alleged acts or omissions constitute fraud, malice, libel, slander, defamation, or any criminal offense besides a traffic violation. MISS. CODE ANN. §§ 11-46-3(1), 11-46-5(1)-(2). Both defamation and tortious interference with business relations are excepted from the MTCA's waiver of sovereign immunity. *See Zumwalt v. Jones County Bd. of Supervisors*, 19 So. 3d 672, 688 (Miss. 2009). Therefore, if AAA is a "political subdivision" within the meaning of the MTCA, it is immune from liability for Wesley's state-law tort claims.

The MTCA defines "political subdivision" as:

[A]ny body politic or body corporate other than the state responsible for governmental activities only in geographic areas smaller than that of the state, including, but not limited to, any county, municipality, school district, charter school, volunteer fire department that is a chartered nonprofit corporation providing emergency services under contract with a county or municipality, community hospital as defined in Section 41-13-10, airport authority, or other instrumentality of the state, whether or not the body or instrumentality has the authority to level taxes or to sue or be sued in its own name.

32

MISS. CODE ANN. § 11-46-1(i). "[A] private corporate entity which is responsible for governmental activities may properly be regarded as a political subdivision under" the MTCA. *Bolivar Leflore Med. Alliance, LLP v. Williams*, 938 So. 2d 1222, 1227 (Miss. 2006). In a line of cases involving tort claims against private, for-profit medical clinics, the Mississippi Supreme Court has held that such corporations can be "instrumentalities" of the state and, therefore, "political subdivisions" as contemplated by Section 11-46-1(i). *See Grimes v. Warrington*, 982 So. 2d 365, 367-69 (Miss. 2008); *Bolivar Leflore*, 938 So. 2d at 1226-32; *Mozingo v. Scharf*, 828 So. 2d 1246, 1254-55 (Miss. 2002).

In *Mozingo v. Scharf*, 828 So. 2d 1246 (Miss. 2002), a patient's parents filed a medical malpractice claim against an anesthesiologist who was employed as an instructor by the University of Mississippi Medical Center and an anesthesiologist by University Anesthesia Services, PLLC ("UAS"), a departmental practice plan at UMMC. 828 So. 2d at 1249. The Court addressed whether the practice plan was a governmental entity which enjoyed immunity under the MTCA. *Id.* at 1254-55.

The Court noted:

> Medical practice plans are organized groups of physicians with medical school faculty appointments who, in addition to research and medical education responsibilities, provide patient care services to both insured and uninsured patients. Most of the medical practice plans utilize UMMC departmental personnel within their respective departments to perform work on behalf of the medical practice plans.

*Id.* at 1254. The practice plan in question, UAS, was "created to provide anesthesia services to patients at UMMC," a "teaching hospital which functions to carry out the

goal of the Legislature . . . ." *Id.* at 1255. It was staffed by UMMC faculty members who were state employees, prohibited from moonlighting on other jobs in private practice, and required to participate in the hospital's practice plans. *Id.* In summary, "UAS was created because of a direct edict from the state agency charged with management of UMMC." *Id.* Therefore, it "was simply an entity created to facilitate the billing and collection of physician fees generated by state employees," and it was "not a private entity." *Id.*

The Mississippi Supreme Court revisited this issue in *Bolivar Leflore Medical Alliance, LLP v. Williams*, 938 So. 2d 1222 (Miss. 2006). The parents of a deceased child filed a wrongful death action against a family medical clinic, Bolivar Leflore Medical Alliance, LLP ("BLMA"). *Id.* at 1224. BLMA was created by Greenwood Leflore Hospital ("GLH"), a "community hospital" as defined by MISS. CODE ANN. § 41-13-10(c) and two doctors. *Id.* at 1223. GLH owned ninety-eight percent of the clinic, while the individuals owned two percent. *Id.* The clinic's profits were distributed to the owners in proportion to their ownership interests, and its operations were managed by a committee created by the owners. *Id.* GLH controlled two-thirds of the committee, while the individuals controlled one-third. *Id.* The committee possessed "full, exclusive and complete authority, discretion, obligation and responsibility" for the clinic's business and operations. *Id.*

The Court noted:

The ultimate test for determining whether a hospital corporation is public or private involves whether its continuity, and its control and management, are under the power of the public through public agents

34

who are responsibly accountable to the government? The arrangement must be such that the *majority control* shall remain in the *public through responsible public agents or managers.*

*Id.* at 1227-28 (punctuation omitted, emphasis original). Accordingly, the Court held that BLMA was an "instrumentality" of GLH. *Id.* at 1232. The Court observed that GLH, a "community hospital" had "nearly total" ownership interest in BLMA and majority control over its executive committee. *Id.* "Such control clearly qualifies BLMA as an intermediary or agent through which certain functions of GLH are accomplished." *Id.*

Finally, in *Grimes v. Warrington*, 982 So. 2d 365 (Miss. 2008), a woman filed a wrongful death suit against a doctor employed by Cleveland Medical Alliance ("CMA"). *Id.* at 366. The facts in *Grimes* were almost identical to those in *Boliver Leflore*, discussed above. *Id.* at 367. CMA was a private medical clinic. *Id.* at 368. Four physician-partners owned four percent of the clinic, while Greenwood Leflore Hospital ("GLH), a "community hospital," owned ninety-six percent of it. *Id.* The partnership agreement among the clinic's owners gave "ultimate control" to GLH, which "maintained majority control of the executive committee. CMA could not take any action nor make any decision without the approval of GLH." *Id.* at 369. Accordingly, CMA was an "instrumentality" of GLH and entitled to the protections of the MTCA. *Id.*

According to its corporate charter, AAA was "created and organized . . . by the Board of Trustees of" Forrest General for the purpose of providing "public ambulance service to the citizens and in the environs of the City of Hattiesburg, Mississippi, and

of the County of Forrest, State of Mississippi."[15] It is a non-profit corporation owned by Forrest General, the City of Hattiesburg, and Forrest County – three political subdivisions of the state of Mississippi.[16] Forrest General controls two-thirds of the voting power on AAA's Board, while Hattiesburg and Forrest County control the remaining third. Forrest General and AAA are parties to a General Management Services Agreement [271-17], under which Forrest County has the authority to operate all aspects of AAA's services and operations. The Agreement also stipulates that all of AAA's key personnel must be employees of Forrest General. Accordingly, each of AAA's officers – its CEO, CFO, and COO – are employees of Forrest General. Additionally, AAA's Chairman of the Board is the Chairman, President, and CEO of Forrest General.

The Court discussed all of this evidence above in its discussion of Wesley's Sherman Act claim. "The ultimate test for determining whether a hospital corporation is public or private involves whether its continuity, and its control and management, are under the power of the public through public agents who are responsibly accountable to the government . . . ." *Bolivar Leflore*, 938 So. 2d  at 1227-28. There is no genuine dispute of material fact on this issue. AAA is wholly owned by political subdivisions, one of which – Forrest General – controls its operations. In accordance with the Mississippi Supreme Court decisions discussed above, Court finds that AAA

---

[15]A copy of AAA's corporate charter can be found attached as Exhibit "A" to AAA's reply brief [274-1].

[16]It is undisputed that Forrest General is a "community hospital" and, therefore, a "political subdivision" within the meaning of MISS. CODE ANN. § 11-46-1(i).

is an instrumentality of the state and, therefore, entitled to the protections, limitations, and immunities of the MTCA. *Grimes*, 982 So. 2d at 369; *Bolivar Leflore*, 938 So. 2d at 1232; *Mozingo*, 828 So. 2d at 1255.

The Court will briefly address Wesley's objections to this interpretation of Mississippi law. First, Wesley notes that an opinion from Mississippi's Attorney General provides: "We have previously opined that a private non-profit corporation is not a political subdivision. We find no statute that provides that AAA, when created, would be a political subdivision of the state . . . ." Miss. A.G. Op. No. 98-0183 (April 10, 1998), 1998 WL 22484, at *2. This argument is unavailing. In the opinion cited by Wesley, the Attorney General's office addressed whether AAA constitutes a "political subdivision" under MISS. CODE ANN. § 27-55-12(1). *Id.* at *1. That chapter – addressing gasoline tax – does not provide a definition of "political subdivision," *see* MISS. CODE ANN. § 27-55-5, while the MTCA includes "instrumentalities" within the definition of a political subdivision. MISS. CODE ANN. § 11-46-1(i). Therefore, the Attorney General addressed a completely different question than the Court faces here. Regardless, the Attorney General's opinion predates the Mississippi Supreme Court decisions cited above. Even if it were on-point, it would be out-of-date.

Next, Wesley argues that AAA is an independent contractor – rather than an instrumentality – of Forrest General, Hattiesburg, and Forrest County. Wesley cites a line of cases addressing whether government contractors are entitled to immunity under the MTCA. The Mississippi Supreme Court has held that "a private company and its employees who provide government activities via contract with a political

37

subdivision are not immune from liability under the MTCA." *Poppenheimer v. Coyle*, 98 So. 3d 1059, 1065 (Miss. 2012); *see also Flye v. Spotts*, 94 So. 3d 240, 247-48 (Miss. 2012). But an "independent contractor" is "a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." *Poppenheimer*, 98 So. 3d at 1064. Forrest General controls AAA and its operations. Therefore, AAA is not an independent contractor.

For all of the reasons stated above, the Court finds that AAA is an "instrumentality" of Forrest General and, therefore, entitled to immunity from Wesley's claims of defamation and intentional interference with business relations. MISS. CODE ANN. §§ 11-46-1(i), 11-46-3(1), 11-46-5(1)-(2); *Zumwalt*, 19 So. 3d at 688. Accordingly, the Court grants AAA's motion for summary judgment as to those claims.

## V. REMAINING MOTIONS

### A.   *Motion to Dismiss [150]*

AAA argues that the Court should dismiss Count One of the Second Amended Complaint – Wesley's request for declaratory relief – for Wesley's failure to join the State of Mississippi as an indispensable party. As the Court previously noted [144], it can not address Wesley's claims regarding the constitutionality of the Destination Guidelines unless Wesley joins the State of Mississippi. *See* FED. R. CIV. P. 19(a)(1)(B); *Hefner*, 779 F.2d at 282; *Lewis*, 792 F.2d at 496 n. 2.

The Court previously held that it would allow Wesley to join the State if it became necessary to address the constitutionality of the Destination Guidelines. It

38

would be inequitable to now dismiss the constitutional claim and preclude Wesley from doing so. AAA's Motion to Dismiss [150] is denied.

**B.    *Motion to Exclude [251]***

The Court denies as moot Wesley's Motion to Exclude Expert Testimony [251].

**C.    *Motion to Strike [264]***

The Court denies as moot Wesley's Motion to Strike [264] Exhibit 26 to AAA's Motion for Summary Judgment. The Court did not consider the disputed exhibit.

**D.    *Motion to Dismiss in Part [266]***

Finally, the Court denies as moot AAA's Motion to Dismiss in Part as Moot [266].

## VI. CONCLUSION

For the reasons stated above, the Court rules as follows:

- The Court **denies** Wesley's Motion for Declaratory Judgment and Injunctive Relief [168];

- The Court **grants** Forrest General's Motion for Summary Judgment [253];

- The Court **grants** AAA's Motion for Summary Judgment [255, 261, 270];

- The Court **denies** AAA's Motion to Dismiss [150]; and

- The Court **denies as moot** Wesley's Motion to Exclude Expert Testimony [251], Wesley's Motion to Strike [264], and AAA's Motion to Dismiss in Part [266].

SO ORDERED AND ADJUDGED this, the 22nd day of January, 2014.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE

39